EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Borschow Hospital & Medical Supplies, Inc.<br>Recurrido<br><br><br>v.<br><br><br>Junta de Planificación de Puerto Rico<br>Recurridos | Certiorari<br><br>2009 TSPR 179<br><br>177 DPR ____ |

Número del Caso: CC-2007-340


Fecha: 18 de noviembre de 2009


  Tribunal de Apelaciones:

                    Región Judicial de San Juan, Panel II


  Juez Ponente:
                Hon. Erik J. Ramírez Nazario


Abogada de la Parte Peticionaria:

            Lcda. Everlidys Rodríguez Pacheco

Abogados de la Parte Recurrida:

            Lcdo. Eric Pérez-Ochoa
            Lcdo. Rafael H. Zapata Yordán
        Lcda. Hilda Quiñones Rivera

Materia:   Revisión Administrativa procedente de la Junta de Planificación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Borschow Hospital & Medical Supplies, Inc. | *Certiorari* |
| Recurrido | CC-2007-340 |
| v. | |
| Junta de Planificación de Puerto Rico | |
| Peticionario | |

Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta

San Juan, Puerto Rico, a 18 de noviembre de 2009.

Nuevamente debemos sopesar la utilización de la figura de la variación como instrumento de planificación en el contexto de las facultades de la Junta de Planificación y de los municipios autónomos para ordenar el desarrollo de los terrenos. En particular, nos corresponde examinar una decisión del Tribunal de Apelaciones que revocó la determinación de la Junta denegando la consulta de ubicación presentada por el recurrido y ordenó a la agencia conceder la variación solicitada por éste. La Junta encontró que la consulta era contraria al plan de ordenación para el Municipio

de San Juan y que la petición de variación requeriría en realidad una rezonificación.

I

Borschow Hospital & Medical Supplies, Inc. presentó una consulta de ubicación ante la Junta de Planificación para la construcción de un almacén de equipo médico y farmacéutico en tres predios de su propiedad, uno de los cuales colinda con la carretera PR-1. El proyecto propuesto sería un desarrollo extenso a ubicarse en el Barrio Tortugo del municipio de San Juan. Agrupadas las fincas, el solar tendría una cabida de 7.32 cuerdas y la construcción en ella ocuparía 120,000 pies cuadrados. Mediante la presentación de la consulta, Borschow Hospital solicitó autorización para reubicar su almacén en dichas fincas. Aclaró que estaban designadas como distritos residenciales de baja densidad R-1, por lo cual solicitó que se aplicaran los parámetros de zonificación I-1. Junto al memorial explicativo de la consulta de ubicación, que se limitó a describir el proyecto y el lugar en donde ubicaría, el proponente solicitó una variación en uso. Fundamentó esta solicitud de la manera siguiente:

> Se propone la ubicación de un proyecto industrial que consiste en la construcción de un almacén de 80,000 pies cuadrados, para ser dedicados a la distribución de equipo medico [sic] y de farmacia terminado, 20,000 pies cuadrados de área de oficinas. No se pretende alterar la salud, el medio ambiente, la seguridad y el bienestar, tanto de sus ocupantes como de las propiedades limítrofes.
> El acceso vehicular al proyecto será a través del Camino Canejas, el cual discurre por la colindancia al norte de la propiedad.

El sector cuenta con la infraestructura necesaria para servir el proyecto como lo son: energía eléctrica, agua potable, alcantarillados, teléfono y los accesos adecuados.

El proyecto también pretende desarrollarse de forma tal que cumpla y cuente con el equipo de prevención contra fuegos necesario para la protección, tanto de la vida humana como de la propiedad.

Una de las parcelas cuenta con una autorización para desarrollo, siguiendo los parámetros de diseño IL-1.[1]

El área aledaña a lo largo de la PR-1 muestra un comportamiento predominantemente industrial, por lo que el desarrollo armoniza con el uso de la zona.[2]

La Junta solicitó los comentarios de varias agencias. La Autoridad de Energía Eléctrica, el Instituto de Cultura Puertorriqueña, el Departamento de Agricultura y la Compañía de Fomento Industrial informaron no tener objeción al proyecto. El Departamento de Recursos Naturales y Ambientales señaló, entre otras cosas, que por colindar el predio con la Quebrada Canejas era necesario dejar una franja de cinco metros desde el borde de la quebrada para uso público. Por su parte, el Servicio de Pesca y Vida Silvestre recomendó que se conservase el estado natural de tres metros adicionales colindantes con la quebrada, para amortiguar el daño que el desarrollo podría causarle.

El 23 de mayo de 2001, el Municipio Autónomo de San Juan solicitó el archivo de la consulta puesto que aún estaba en vigor una moratoria decretada por la Junta que prohibía la otorgación de autorizaciones o permisos de

---

[1] No surge del expediente dicha autorización, por lo que desconocemos el contenido y la vigencia de lo que alegadamente se concedió.

[2] Apéndice de la petición de *certiorari*, pág. 181.

construcción en la zona sur del municipio, debido a la elaboración del plan de ordenación territorial para San Juan. Aunque no se archivó la consulta, se dejó en suspenso su consideración hasta que se preparara y sometiera la evaluación ambiental.

Antes de vencer la moratoria, el municipio de San Juan condicionó su endoso al proyecto con las siguientes expresiones:

> Al momento de la evaluación del proyecto, nuestra oficina no tiene objeción con el desarrollo del mismo ya que es cónsone con la política pública del Municipio de San Juan en apoyar  este tipo de proyecto, para así crear un corredor industrial a lo largo de la PR #1.
> Este endoso está condicionado a la adopción del Plan de Ordenamiento Territorial (POT) o con la conclusión del actual período de moratoria en agosto de 2001, lo que suceda primero. **Además, el proyecto deberá ser cónsone con las disposiciones del Plan de Ordenamiento Territorial (POT).** (Énfasis suplido.)[3]

Nuevamente, se dejó en suspenso la consulta debido a que la Junta le había ordenado al municipio que indicara la manera en que el proyecto propuesto se conformaba al plan de ordenación territorial, particularmente, a la calificación y clasificación propuesta para los terrenos en controversia.[4]

_____

[3] Apéndice de la petición de *certiorari*, pág. 417.

[4] Por su parte, el Departamento de Transportación y Obras Públicas expresó su conformidad con la consulta de ubicación, condicionado a que se llevasen a cabo ciertas mejoras en la intersección de la calle Canjeas con la carretera PR-1 a los efectos de que se proveyera un carril de viraje dentro de la servidumbre de paso existente de la Carretera PR-1 en la dirección norte a sur frente al acceso de la calle Canejas, y que se dedicara a uso público una franja de terreno necesaria para completar una futura obra

En cumplimiento con lo solicitado por la Junta, el municipio

de San Juan, informó lo siguiente:

> De acuerdo al POT, se propone clasificar la propiedad donde se construirá el proyecto como Suelo Urbano (SU) la franja hacia la Carretera PR-1 y Suelo Rústico Común (SRC) el terreno restante. Este último tiene dos calificaciones: Suelo Rústico Poblado (SRP) y Bosque Uno (B-1).

> El Municipio propone desarrollar un Plan de Área para el corredor industrial de Tortugo en una sección de la PR-1. No obstante, **en estos momentos no tenemos un estudio preciso que determine el ancho para dicho corredor** el cual dependerá de la geografía y pendientes del suelo y de la franja de terreno que se estime necesario dedicar a uso público para la futura ampliación de la PR-1.

> Por otra parte, entendemos que el uso de almacén y oficina propuesto es cónsone con las características industriales y comerciales de la zona y con las políticas públicas del Plan de Ordenación Territorial de San Juan.

> Por lo antes expuesto, **recomendamos que el proyecto se ajuste a lo propuesto en el POT** y no exceda el límite de los 200 metros establecidos para el corredor industrial, excluyendo el ensanche de la PR-1. (Énfasis nuestro.)[5]

Finalmente, se celebraron vistas públicas para la

consideración de la consulta de ubicación. El aviso de vista

pública anunció una propuesta de enmienda a los mapas de

zonificación de un distrito R-1 a I-1. Aunque no asistieron

a la vista pública, los vecinos presentaron sus comentarios

por escrito. Se opusieron a la ubicación del proyecto en la

entrada principal de la comunidad residencial y expusieron

que el camino municipal no fue diseñado para la entrada y

---

en la carretera PR-1. Además, requirió que el acceso a la propiedad fuera por la calle Canejas.

[5] Apéndice de la petición de *certiorari*, pág. 460.

salida de camiones, lo cual crearía un peligro para los vecinos. En particular, señalaron que:

> La carretera que sirve la comunidad y que el proyecto propuesto planea utilizar como acceso único no cuenta con aceras ni encintados, es bastante estrecha, no tiene líneas pintadas de ningún tipo y tiene unas pendientes considerables. Mas [sic] del 50% de los vecinos del area [sic] no poseen carro, tienen que caminar por ésta [sic] carretera sin aceras hasta la parada de guaguas ubicada en la PR-1 frente al proyecto propuesto.[6]

Además, los vecinos indicaron que el sector es primordialmente residencial y que el único negocio industrial es de "Bus Rental & Service", que se utiliza mayormente como taller de mecánica. Refutaron la alegación de que el predio fuera utilizado como vertedero clandestino, puesto que "la familia Guerrero que vivió allí hasta hace poco tiempo siempre mantuvo su propiedad muy bonita y llena de árboles"[7] y exhortó que la Junta mantuviera la zonificación residencial del sector. Finalmente, señalaron que era falsa la alegación de que el uso propuesto fuera beneficioso para los vecinos, toda vez que las plazas de trabajo que se prometen crear no serán para emplear a los vecinos, ni existe un clima violento e inseguro, como alegó el proponente, que se pueda aliviar con la ubicación de dicho proyecto en un sector predominantemente residencial.

Aún pendiente el informe y la recomendación del oficial examinador, el 13 de marzo de 2003 entraron en vigor el Plan de Ordenación Territorial y el Reglamento de Ordenación Territorial. Boletín Administrativo Núm. OE-2003-16 de 13 de

---

[6] Apéndice de la petición de *certiorari*, pág. 559.
[7] Apéndice de la petición de *certiorari*, pág. 560.

marzo de 2003. Por lo tanto, al emitir su recomendación, el oficial examinador hizo referencia al Reglamento de Ordenación Territorial del Municipio de San Juan. De acuerdo a los mapas, el predio objeto de la consulta quedó comprendido dentro del distrito clasificado como suelo rústico común, calificado bosque uno (B-1). El oficial examinador concluyó que dentro de los usos tolerados de dichos distritos no figura el uso industrial propuesto ni el desarrollo extenso, conforme la Tabla IV, Apéndice II y a la Sección 4.04 del Reglamento de Ordenación, respectivamente. Por su colindancia con la Quebrada Canejas al sur y al este, el oficial examinador además concluyó que la zonificación estaba en armonía con sus propósitos. Por lo tanto, recomendó denegar la aprobación de la consulta.

La Junta, fundamentándose en los comentarios de la vista pública y las recomendaciones del oficial examinador, denegó la consulta de ubicación al concluir que ésta es contraria al plan de ordenación territorial que ya había entrado en vigor. La Junta determinó que:

> El área aledaña al predio objeto de la consulta muestra un comportamiento mixto, residencial, industrial y comercial. Además, la comunidad cuenta con **facilidades recreativas**. Por la colindancia Norte del predio objeto de la consulta, al cruzar el camino municipal Canejas, ubican United Tile Corp., la Bus Rental and Services, la Kar Klinic y **varias residencias**. Asimismo, por el linde Sur, al otro lado de la quebrada Canejas, se encuentras un cementerio de animales y una ferretería; hacia el Este, al otro lado del camino municipal, existen **varios usos residenciales**. Por la colindancia del Oeste del predio ubica el corredor PR-1 y **varias residencias**; al cruzar la PR-1 se encuentra un

parque de pelota y estacionamientos comerciales de cafetería. (Énfasis nuestro.)[8]

Inconforme, Borschow Hospital solicitó reconsideración y planteó que el proyecto se debió haber evaluado a tenor con la reglamentación vigente al momento de la solicitud. Indicó, a su vez, que el mismo concordaba con el futuro corredor industrial propuesto por el municipio de San Juan a ubicarse en la carretera PR-1. La Junta declaró sin lugar la petición. Por tal razón, el proponente recurrió al Tribunal de Apelaciones. Alegó que la Junta erró al determinar que el proyecto propuesto no cumple con el plan territorial del municipio y que la determinación de la Junta desatiende los intereses del municipio de San Juan de crear dicho corredor industrial. Además, arguyó que la Junta incidió al determinar que los distritos B-1 no toleran el uso industrial propuesto y al no aplicar el mecanismo de la variación para el proyecto en controversia. Por último, adujo que la determinación de la Junta es arbitraria y caprichosa porque es contraria a la evidencia que obra en el expediente administrativo.

En cumplimiento de orden, compareció la Junta para argumentar en contra de los señalamientos de error de la parte proponente. En particular, señaló que el municipio de San Juan no había concretado la ubicación del corredor industrial al momento de la presentación de la consulta de ubicación, cuando se le requirió al municipio que sometiera sus comentarios en torno al proyecto. Además, la Junta

---

[8] Apéndice de la petición de *certiorari*, pág. 614.

indicó que el Subprograma de Planes de Usos de Terrenos, específicamente en el Programa de Actuación del Plan Territorial y en la Reforma Interior de Comunidad para el Barrio Tortugo, no contempla usos industriales. Tampoco los terrenos implicados en la consulta forman parte del corredor industrial, puesto que en esos documentos se reconoce y se preserva la calidad rural del área. Además, por colindar con la quebrada Canejas, el predio en controversia correctamente se clasificó como B-1, lo que concuerda con las disposiciones de la sección 9.03 del reglamento de ordenación territorial.

En cuanto a la variación, la Junta señaló que no hay referencia alguna en el expediente a una variación en uso. En cambio, el aviso de vista pública anunciaba un cambio de zonificación, lo cual de por sí excluye la aplicación del mecanismo de variación en uso. Además, enfatizó en que se puede conceder una variación cuando el uso propuesto es compatible con los propósitos del distrito, contrario a los que ocurre en este caso, puesto que los usos industriales propuestos son incongruentes con los propósitos delineados por el reglamento para los distritos calificados Bosque Uno (B-1). La Junta también arguyó que para poder conceder una variación se requiere que no se afecten adversamente la seguridad y tranquilidad de los vecinos. Sin embargo, señaló que en su resolución había concluido todo lo contrario, a saber, que el proyecto propuesto no propiciaba la seguridad

de los vecinos. Ello de por sí es un fundamento suficiente para denegar una petición de variación.

La parte proponente replicó al alegato de la Junta. Entre otras cosas, arguyó que la denegación de la consulta carecía de fundamento y que la consulta realmente era una solicitud de variación, a pesar de que la Junta unilateralmente había tramitado la petición como un cambio de zonificación.

Consideradas estas comparecencias, el Tribunal de Apelaciones resolvió revocar la determinación de la Junta y conceder una variación en uso. El foro apelativo concluyó que no habían razones meritorias para denegar la variación y ordenó la devolución del caso a la Junta para que aprobara la consulta de ubicación de forma compatible con lo resuelto. En particular, determinó que aunque la calificación B-1 no autoriza proyectos industriales, el reglamento de ordenación del municipio faculta a la Junta para conceder variaciones en uso cuando se establezca que ninguno de los usos permitidos para el distrito es factible. El tribunal apelativo concluyó que no había en el expediente objeciones serias al proyecto y que, al contrario, las agencias pertinentes lo habían endosado. Por ello, el tribunal resolvió que la Junta había actuado arbitrariamente al denegar la consulta, sin base en el expediente administrativo. El tribunal apelativo concluyó, además, que "el proyecto propuesto propicia la seguridad que al presente

no existe en el lugar a ser desarrollado"[9] y que procede, pues, conceder una variación, ya que no hacerlo resultaría en una confiscación del disfrute de la propiedad privada y el proyecto es cónsono con las características industriales del área y con la política pública del municipio de crear un corredor industrial.

Inconforme con la decisión del Tribunal de Apelaciones, la Junta presentó el recurso de *certiorari* que hoy nos ocupa y alegó que la decisión del tribunal apelativo fue errada en cuanto determinó que la Junta actuó incorrectamente al fundamentarse únicamente en que el proyecto no cumplía con el plan de ordenación territorial del municipio de San Juan para denegar la consulta. Resolvió, además, que la Junta debió haber autorizado la variación. El 18 de mayo de 2007 expedimos el auto. Luego, ambas partes presentaron sus alegatos, por lo cual procedemos a resolver la controversia.

II

La Junta de Planificación tiene la encomienda de guiar el desarrollo integral del país y fomentar el bienestar social a través de dicho proceso. 23 L.P.R.A. sec. 62c. Para ello se le ha concedido facultad para reglamentar y conceder autorizaciones con relación a la distribución de la población y los distritos de zonificación. En este esquema, la zonificación o rezonificación y las consultas de ubicación son los instrumentos por excelencia a través de

---

[9] Apéndice de la petición de *certiorari*, pág. 40.

los cuales la Junta puede desempeñar su poder de implantar la política pública de planificación y urbanismo.

Hemos dicho que el acto de adoptar o enmendar la zonificación de un distrito es un ejercicio del poder de reglamentación que solamente la Junta puede llevar a cabo. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 83 (1999); Luan Investment Corp. v. Román, 125 D.P.R. 533, 546 (1990). Ante una petición de rezonificación se requiere analizar el propósito de la zonificación original del área y el ambiente prevaleciente. Si las circunstancias del área donde ubica el solar cuya rezonificación se propone han cambiado con el tiempo, la agencia tiene la discreción de permitir la enmienda en el mapa de zonificación. De lo contrario, la zonificación existente debe preservarse. Montoto v. Lorie, 145 D.P.R. 30, 43-44 (1998).

La consulta de ubicación es un instrumento de planificación mediante el cual la Junta evalúa, considera y autoriza o deniega una propuesta sobre el uso de un terreno particular. T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 85; Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998). La variación es un instrumento de planificación cuyo fin es atemperar la severidad que resulta al someter a un predio particular las restricciones correspondientes a la calificación del terreno. En ocasiones hemos dicho que el dueño o su representante autorizado podrá solicitar una variación en uso cuando entienda que la aplicación literal de los reglamentos de zonificación a su propiedad particular

equivale a una confiscación a su disfrute Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 769-770 (1987); López v. Junta de Planificación, 80 D.P.R. 646, 654 (1958). Con la variación solamente se autoriza un uso prohibido por las restricciones propias de un distrito, sin sacrificar su compatibilidad con los propósitos de dicho distrito, mientras que la rezonificación altera el propósito de la zona con la asignación de una calificación distinta. No obstante, la magnitud de la variación solicitada es un elemento a considerar, así como el efecto adverso que podría tener la concesión sobre el ambiente de la calle y la seguridad y tranquilidad de los vecinos, entre otros. Véanse, Subsección 62.01 del Reglamento de Calificación de Puerto Rico, Reglamento Núm. 7628 de 11 de diciembre de 2008; Subsección 82.05 del Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 6211 de 5 de octubre de 2000.[10]

---

[10] Aunque se citan ambas reglamentaciones de la Junta de Planificación, la que es aplicable a esta controversia es la del año 2000 porque los hechos y la adjudicación administrativa se suscitaron previo a la enmienda realizada al reglamento durante el 2008. La subsección 62.01 del Reglamento de Calificación de Puerto Rico dispone lo siguiente:

La Junta o la ARPE, según corresponda, podrán considerar variaciones en uso cuando se demuestre que ninguno de los usos permitidos en el distrito de calificación es factible desde el punto de vista físico o económico, tomando en consideración lo siguiente:

1. el costo de adaptar la propiedad a los usos permitidos debido a disposiciones de este Reglamento y el beneficio que se derivaría una vez adaptada ésta para los usos permitidos,

2. las razones por las cuales ningún uso permitido es factible en la propiedad sin la variación, deben ser

únicas a la misma y no una característica general del distrito o del sector del distrito donde ubica. No podrán haber sido causados por el dueño,

3. el uso para el cual se solicita la variación a las disposiciones reglamentarias es compatible con los propósitos del distrito y del vecindario o comunidad en que ubica,

4. la variación solicitada no afecta adversamente, entre otros, los siguientes factores:

    a) la disponibilidad de infraestructura

    b) el contexto en el que ubica

    c) el ambiente del vecindario

    d) la seguridad y tranquilidad de los vecinos

    e) el uso propuesto beneficia al vecindario

    f) el uso para el cual se solicita la variación está permitido por las disposiciones del Tópico 4 sobre Zonas Escolares de este Reglamento. Reglamento Núm. 7628 de 11 de diciembre de 2008, págs. 248-249.

Por su parte, la subsección 82.05 del Reglamento de Zonificación de Puerto Rico indica que se deberán tomar en consideración los siguientes factores:

1. La magnitud de la variación es la necesaria para asegurar la viabilidad del uso permitido y no es viable considerar otras alternativas para salvar el problema presentado.

2. La variación solicitada no afectará adversamente, entre otros, los siguientes factores:
    a. La disponibilidad de la infraestructura
    b. El contexto en el que ubica
    c. El ambiente de la calle
    d. La seguridad y tranquilidad de los vecinos

3. Se logra un desarrollo urbano más compacto

4. La densidad o intensidad solicitada no lleva a convertir el distrito en otro.

5. La variación solicitada es cónsona con los propósitos de la disposición reglamentaria que se solicita sea modificada, así como con la

El procedimiento adjudicativo de la Junta requiere que cuando una consulta de ubicación conlleve alguna variación, se someta junto a la consulta una solicitud de variación con las razones que la apoyan. Véanse, Subsección 4.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 7629 de 11 de diciembre de 2008, págs. 8-9; Subsección 4.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 del 13 de octubre de 1999, págs. 18-19.[11] Además, la subsección 4.09 del Reglamento de Zonificación establece los requisitos a seguir cuando los cambios de zonificación se solicitan mediante una consulta de ubicación. Reglamento Núm. 6211, *supra*, pág. 50. Véase además, Subsección 4.11 del Reglamento de Calificación, Reglamento Núm. 7628, *supra*, pág. 36.

La Ley de Municipios Autónomos también otorga la facultad a los municipios de ordenar su territorio municipal con un plan territorial. Esto responde a una política pública de reformar el sistema de planificación, a los fines de hacer de la gestión municipal "un vínculo fundamental entre el ciudadano y el gobierno". Esta política pública va "dirigida a proporcionar un uso juicioso y aprovechamiento óptimo del territorio municipal para asegurar el bienestar de las generaciones actuales y futuras, promoviendo un

política pública. Reglamento Núm. 6211 de 5 de octubre de 2000, págs. 287-288.

[11] A pesar de mencionar ambas normativas, la aplicable a este caso es el Reglamento Núm. 6031 de 1999.

proceso de desarrollo ordenado, racional e integral de sus terrenos". Véase, Memorial Explicativo del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, Reglamento de Planificación Núm. 24 de 20 de mayo de 1994.

Esta ley requiere que los planes de ordenación de un municipio autónomo se trabajen en estrecha relación con la Junta y otras agencias del gobierno, para asegurar la cohesión con los planes estatales, regionales y de otros municipios. Conforme a ello, el artículo 13.011 de la Ley de Municipios Autónomos dispone:

> El municipio se asegurará de mantener un estrecho enlace y colaboración con la Junta de Planificación en todo lo relacionado a la elaboración y adopción de los Planes de Ordenación. También establecerá la necesaria coordinación con otras agencias públicas, especialmente aquellas relacionadas a la transportación, la infraestructura, los recursos naturales, la agricultura y el desarrollo industrial. La Junta de Planificación velará por la compatibilidad de lo propuesto con otros Planes de Ordenación y otras políticas públicas relevantes a los asuntos incluidos en el plan bajo consideración y podrá permitir criterios más estrictos pero no más laxos que los establecidos en los documentos de política pública de aplicación general en el país. El Plan de Ordenación que se adopte será el resultado de la consulta y coordinación entre las agencias públicas y el municipio. 21 L.P.R.A. sec. 4609.

Además, para que entren en vigor, los planes de ordenación requerirán la aprobación de la legislatura municipal, la adopción por la Junta, y la aprobación del Gobernador. Art. 13.008 de la Ley de Municipios Autónomos (21 L.P.R.A. sec. 4606).

El plan territorial es el primer paso para que un municipio pueda continuar ejerciendo autónomamente las demás facultades de planificación y urbanismo que le fueren delegadas por la Ley de Municipios Autónomos a través del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, supra. El artículo 13.004 de la Ley de Municipios Autónomos establece que hay tres tipos de planes de ordenación territorial que atienden diferentes aspectos de planificación: el plan territorial, el plan de ensanche y el plan de área. 21 L.P.R.A. sec. 4602. El plan de área sirve para ordenar el uso del suelo de áreas que requieran atención especial, sin llegar a "convertir suelo rústico en suelo urbano o urbanizable, [puesto que] dicha acción requerirá de la revisión del Plan Territorial". Art. 13.007 de la Ley de Municipios Autónomos, supra (21 L.P.R.A. sec. 4605(5)).

Una vez entre en vigor el plan territorial de un municipio, toda decisión de la Junta de Planificación sobre el uso del suelo deberá ser conforme al mismo. Véase, Art. 13.005 de la Ley de Municipios Autónomos (21 L.P.R.A. sec. 4603) y el Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, supra, en su sección 7.01, pág. 7-1. Para facilitar que esto sea así, tanto en la Ley de Municipios Autónomos como en el reglamento establecen un mecanismo mediante el cual el municipio, la Junta o ARPE pueden declarar una moratoria a la concesión de nuevos permisos. Véanse Art. 13.009 de la

Ley de Municipios Autónomos, supra (21 L.P.R.A. sec. 4607);

Sec. 17.00 del Reglamento de Planificación Núm. 24, supra,

págs. 17-1 a 17-05.

Los planes territoriales son el instrumento de

ordenación integral y estratégico que abarca todo el

municipio y divide la totalidad del suelo en tres

clasificaciones: suelo urbano, suelo urbanizable y suelo

rústico. 21 L.P.R.A. sec. 4603. Dentro de las definiciones

incluidas en la Ley de Municipios Autónomos, se establece

que suelo rústico:

> Significará una clasificación del terreno en
> el Plan Territorial y estará constituido por los
> terrenos que el Plan Territorial considere que
> deban ser expresamente protegidos del proceso
> urbanizador[12] por razón, entre otros, de su valor
> agrícola y pecuario, actual o potencial; de su
> valor natural; de su valor recreativo, actual o
> potencial; de los riesgos a la seguridad o salud
> pública; o por no ser necesarios para atender las
> expectativas de crecimiento urbano en el futuro
> previsible de ocho (8) años. Art. 13.003(ee) de la
> Ley de Municipios Autónomos (21 L.P.R.A. sec.
> 4601).

Dicha clasificación busca proteger ciertos terrenos de la

urbanización, evitar la destrucción del patrimonio natural o

del paisaje, establecer planes para el manejo de los

recursos naturales y agrícolas o identificar los suelos

cuyas características particulares merecen ser protegidos

---

[12] La Ley de Municipios Autónomos define "proceso urbanizador" de la siguiente manera:

> Significará todo desarrollo que transforme un
> suelo no urbano con obras, tales como desarrollo
> de vías, provisión de acueductos y alcantarillado
> sanitario, suministro de energía eléctrica,
> movimiento de tierra, y desarrollo de estructuras
> agrupadas que le den característica de suelo
> urbano. 21 L.P.R.A. sec. 4601(v).

especialmente. Dentro de esta clasificación, los suelos podrán ser catalogados como suelo rústico común o suelo rústico especialmente protegido. El suelo rústico común es "aquél no contemplado para uso urbano o urbanizable en un Plan Territorial debido, entre otros, a que el suelo urbano o urbanizable clasificado por el Plan es suficiente para acomodar el desarrollo urbano esperado". Art. 13.005 de la Ley de Municipios Autónomos (21 L.P.R.A. sec. 4603). El suelo rústico especialmente protegido es "aquél no contemplado para uso urbano o urbanizable en un Plan Territorial, y que por su especial ubicación, topografía, valor estético, arqueológico o ecológico, recursos naturales únicos u otros atributos, se identifica como un terreno que nunca deberá utilizarse como suelo urbano". Íd.

El plan territorial se desarrollará, junto con otros documentos, mediante la reglamentación, la cual incluye los planos de clasificación del suelo y los reglamentos y planos de ordenación. Íd. En particular, el Reglamento de Ordenación Territorial del Municipio de San Juan, bajo la ordenación del suelo rústico, establece dos calificaciones de distritos: el suelo rústico poblado (SRP) y el distrito de bosque interior (B-1). El propósito de calificar un suelo rústico como bosque interior, según dicho reglamento, es "para identificar los terrenos con características especiales para la siembra de árboles, para la producción de madera y para la protección del suelo y del agua". Sección 9.03a del Reglamento de Ordenación Territorial del

Municipio de San Juan, *supra*, pág. 158. Dicha sección, además, explica lo siguiente:

> Las características especiales de estos terrenos se basan en el tipo de suelo, la topografía y la humedad relativa en los mismos. Estos distritos incluyen los terrenos comprendidos por los bosques existentes así como aquellos recomendados a ser repoblados y los terrenos vinculados a las cuencas hidrográficas de fuentes de abasto de agua (actual o potencial), a los márgenes de los ríos y quebradas, y a importantes recursos escénicos. Íd.

El reglamento del municipio de San Juan dispone los usos permitidos en los distritos B-1, o bosque interior, y sus limitaciones. En particular, la Tabla IV del Apéndice II del reglamento permite los siguientes usos:

1. Casas de una o dos familias en solares con cabida de 25 cuerdas,

2. Construcción de caminos y establos para caballos como complementos al deporte de paseos de caballos,

3. Edificios y usos accesorios estrechamente relacionados o complementarios a los usos principales,

4. Usos agrícolas… especialmente para la siembra de árboles aunque también se permiten siembras, cosechas, crianzas de animales que no conflijan con el desarrollo forestal,

5. Venta de productos cosechados en la finca incluyendo madera, siempre que el corte se conduzca en forma científica y no conlleve la deforestación, cuyo espacio será limitado a un edificio cuya área no excederá de 75 metros cuadrados,

6. Vivienda adicional de segunda planta,

7. Facilidades para muelles o rampas para un máximo de diez embarcaciones, la cual requerirá una certificación de que el proyecto es compatible con el Programa de Manejos de la Zona Costanera. Tabla IV, Apéndice II del Reglamento de Ordenación Territorial del Municipio de San Juan, págs. 38-39.

Como vemos, se permiten ciertos proyectos y obras en los distritos B-1. Por eso, el reglamento del municipio establece requisitos particulares para la construcción en dichos distritos. La sección 9.03(m)(1) del Reglamento dispone que los edificios y obras a llevarse a cabo deben ser en forma compacta y en espacios que afecten los menos posible el área forestada, evitándose, además, la impermeabilización de terrenos y la alteración de la topografía y los rasgos del lugar, en aras de asegurar "un balance positivo donde el ambiente natural prevalezca sobre el desarrollo". Íd., pág. 161. Además, una de las limitaciones particulares a los usos permitidos en los distritos B-1 es la protección de la vegetación densa dentro de los Planes Especiales del Sur del Municipio de San Juan, entre los cuales hace referencia a la Reforma Interior de Comunidad (RIC) 48 del Barrio Tortugo. Sec. 9.03(c)(1)(b) del Reglamento, supra, pág. 158. La RIC 48 reconoce la calidad rural de dicha comunidad y, cónsono con ello, en cuanto a los planes de desarrollo económico, la RIC establece la rehabilitación de viviendas.[13]

Para atemperar una posible aplicación inconstitucional de estos y otros requisitos o limitaciones de los reglamentos de planificación, existe el instrumento de la variación, el cual, según el artículo 13.012(e)(1)(c) de la Ley de Municipios Autónomos, será una facultad exclusiva de la Junta y de ARPE. Art. 21 L.P.R.A. sec. 4610(e)(1)(c).

---

[13] Apéndice de la petición de certiorari, págs. 84-85.

Por lo tanto, al disponer sobre el proceso de la concesión de variaciones, el Reglamento de Ordenación Territorial del Municipio de San Juan le permite a la Junta, a ARPE y al Municipio de San Juan "según corresponda por la radicación y etapa del caso", conceder variaciones a los requisitos del reglamento de ordenación municipal para evitar que la aplicación literal de su ordenación resulte en una confiscación al disfrute de la propiedad. Sec. 16.01(a) del Reglamento, supra, pág. 220. El reglamento requiere que para considerar una variación, el solicitante justifique los usos que propone. Además, requiere que se establezca que dichos usos son cónsonos con el propósito y la política pública y que "la magnitud de la variación es la necesaria para asegurar la viabilidad y evitar un perjuicio y que no es viable considerar otras alternativas". Sec. 16.01(b) del Reglamento, supra, pág. 220. Para solicitar una variación en uso, el solicitante debe establecer que de aplicarse los requisitos del distrito a su propiedad particular, ninguno de los usos permitidos es factible desde el punto de vista físico o económico. La sección 16.01(c) requiere que se tome en consideración lo siguiente:

1. El costo de adaptar la propiedad a los usos permitidos debido a disposiciones de este u otros reglamentos y el beneficio que se derivaría una vez adaptada ésta para los usos permitidos.

2. Las razones por las cuales ningún uso permisible es factible en la propiedad sin la variación deben ser únicas a la misma y ni una característica general del distrito o del sector del distrito donde ubica. No podrán haber sido causados por el dueño.

3. El uso para el cual se solicita la variación a
   las disposiciones reglamentarias es compatible
   con los propósitos del distrito y con el
   vecindario o comunidad en que ubica.

4. La variación solicitada no afecta adversamente,
   entre otros, los siguientes factores:
   a. La disponibilidad de infraestructura
   b. El contexto en el que ubica
   c. El ambiente de la calle
   d. La seguridad y tranquilidad de los vecinos

5. El uso propuesto beneficia al vecindario. Íd.,
   pág. 221.

Finalmente, en cuanto a la aplicación temporal de los reglamentos, en Maldonado v. Junta de Planificación, 2007 T.S.P.R. 87, resolvimos que un reglamento aprobado luego de haberse presentado una consulta de ubicación, puede ser fundamento suficiente para denegar la consulta si al momento de su presentación "el proceso de aprobación de la misma [la reglamentación] ya había comenzado oficialmente y… se habían hecho gestiones tendentes a informar al pueblo sobre el particular". Íd., pág. 21.

III

La Junta sostiene que el Tribunal de Apelaciones erró al resolver que dicha agencia no podía denegar la autorización de la consulta de ubicación presentada por el proponente meramente porque el plan territorial del municipio calificó los terrenos como bosque interior, habida cuenta que el Reglamento de Ordenación del Municipio de San Juan permite la concesión de variaciones. Arguyó la Junta que los usos propuestos en la consulta de ubicación contravienen la ordenación territorial municipal y el foro

apelativo no podría exigir a la Junta que concediera una variación en uso que altere la calificación de los terrenos como bosque interior y, por tanto, constituyera una rezonificación. Por los fundamentos que expondremos a continuación, resolvemos que efectivamente erró el Tribunal de Apelaciones.

La norma general es que las decisiones de los organismos administrativos deben ser consideradas con gran deferencia por los tribunales apelativos, por razón de la experiencia y pericia de las agencias respecto a las facultades que se les han delegado. Sus decisiones deben ser respetadas a menos que la parte recurrente establezca que hay evidencia en el expediente administrativo suficiente para demostrar que la agencia no actuó razonablemente. Véase, Hatillo Cash & Carry v. A.R.P.E., 2008 T.S.P.R. 97; Otero v. Toyota, 163 D.P.R. 716 (2005); Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000).

Como vemos de los hechos relacionados, la Junta tramitó el caso como si se tratase de una rezonificación y celebró vistas públicas para enmendar los mapas de zonificación. Borschow Hospital sostiene que la consulta de ubicación incluyó una solicitud de variación en uso y no de rezonificación. Aunque lo dicho es cierto, el nombre no hace la cosa. Por eso, resolvemos que la Junta atendió correctamente la consulta de ubicación como una solicitud de rezonificación porque el proponente no justificó su solicitud de variación en uso.

Las variaciones se conceden discrecionalmente y a solicitud de parte, para evitar una confiscación inconstitucional al disfrute de la propiedad privada. Por lo tanto, corresponde al solicitante poner a la Junta en posición de evaluar su petición y demostrar que ésta cumple con los criterios establecidos para guiar la discreción de la agencia. En este caso particular no ocurrió así. Borschow Hospital debió explicar en qué manera su propiedad estaba particularmente afectada por la aplicación del reglamento de zonificación, cuyo efecto resultaba en una confiscación del disfrute de su propiedad. Sin embargo, ni siquiera mencionó ese elemento indispensable para justificar una variación. Como el nombre no hace la cosa, la Junta atendió la consulta de ubicación de acuerdo con lo que el proponente realmente buscaba, que era ubicar un proyecto industrial en un distrito residencial. De la misma manera, el Tribunal de Apelaciones no estaba en posición de considerar los méritos de la variación toda vez que los elementos de juicio para ello están ausentes del expediente administrativo. Por lo tanto, no podemos determinar que la Junta haya actuado arbitrariamente.

Por otro lado, el proponente contiende que es política pública del municipio de San Juan crear un corredor industrial a lo largo de la carretera PR-1 y que por ello la Junta debió haber concedido la consulta de ubicación. Respecto a esto, cabe señalar que la Junta adjudicó la consulta de acuerdo a las directrices de ordenación

territorial puestas en vigor por el municipio en su Plan de Ordenación Territorial. El municipio calificó las fincas objeto de la consulta como suelo rústico y, de esta manera, las excluyó de cualquier plan industrial debido a su ubicación. Por otra parte, llama la atención que, más allá de sus comparecencias ante la Junta, el municipio de San Juan no ha mostrado interés en impugnar la determinación de dicha agencia especializada.

Resolvemos que la Junta actuó razonablemente al denegar la consulta de ubicación de Borschow Hospital y cumplió con el debido proceso de ley al implantar el plan territorial del municipio de San Juan, reglamentación vigente y aplicable. La Junta no fue arbitraria al aplicar un reglamento que ya había entrado en vigor y por sus propios términos exige que se tome en consideración. Estamos ante unos hechos similares a los de Maldonado v. Junta de Planificación, supra, en el cual este Tribunal estableció los criterios para determinar si al adjudicar una consulta de ubicación  se puede aplicar una reglamentación adoptada mientras ésta estaba pendiente ante la agencia.  Siendo ello así, y acorde a la norma allí adoptada, no erró la Junta al aplicar al presente caso los requisitos que impone la calificación del plan territorial del municipio de San Juan y las limitaciones de un distrito B-1. La alegación que el municipio tiene planificado para en un futuro crear un corredor industrial dentro de su territorio, no puede ser fundamento para resolver que la Junta actuó caprichosamente.

Primeramente, el plan para crear un corredor industrial aún no está en etapa de implementación, ya que todavía están pendientes las vistas públicas para el plan de área. Además, como bien señala la Junta, un plan de área no puede alterar el plan territorial y cambiar, por estos medios, la calificación de suelo rústico a suelo urbano.

Al contrario, la Junta tomó en consideración y respetó los comentarios del municipio de San Juan, que había endosado el proyecto **condicionado a la configuración final del plan territorial que en ese momento se trabajaba.** Al denegar la consulta de ubicación, la Junta protegió la discreción del municipio para ordenar su territorio municipal.

Por todo lo anterior, revocamos la sentencia del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Borschow Hospital & Medical Supplies, Inc.
            Recurrido

      v.

Junta de Planificación de Puerto Rico
            Peticionario

*Certiorari*

CC-2007-340

*SENTENCIA*

En San Juan, Puerto Rico, a 18 de noviembre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Rivera Pérez no intervino. La Jueza Asociada señora Pabón Charneco no interviene.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo